IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

HUNTINGTON DIVISION

BOBBY THOMPSON,

      Plaintiff,

v.                                         Case No.: 3:14-cv-15949

CAROLYN W. COLVIN,
Acting Commissioner of the
Social Security Administration,

      Defendant.

## PROPOSED FINDINGS AND RECOMMENDATIONS

This action seeks a review of the decision of the Commissioner of the Social Security Administration (hereinafter "Commissioner") denying Plaintiff's application for a period of disability and disability insurance benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 401-433. The matter is assigned to the Honorable Robert C. Chambers, United States District Judge, and was referred to the undersigned United States Magistrate Judge by standing order for submission of proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B). Presently pending before the Court are the parties' cross motions for judgment on the pleadings as articulated in their briefs. (ECF Nos. 7 & 8).

The undersigned has fully considered the evidence and the arguments of counsel. For the following reasons, the undersigned **RECOMMENDS** that Plaintiff's motion for judgment on the pleadings be **DENIED**; that the Commissioner's motion for judgment on the pleadings be **GRANTED**; that the decision of the Commissioner be

**AFFIRMED**; and that this case be **DISMISSED**, **with prejudice,** and removed from the docket of the Court.

## I.   <u>Procedural History</u>

On December 19, 2011, Plaintiff Bobby Thompson ("Claimant"), filed an application for DIB, alleging a disability onset date of May 1, 2010, due to "osteoarthritis ankles, back, elbows, hands, shoulders; GERD [gastroesophageal reflux disease]; left wrist/rt shoulder injury; anxiety; osteoarthritis in knees; torn right rotator cuff, arthritis spur." (Tr. at 145, 174). The Social Security Administration ("SSA") denied Claimant's application initially and upon reconsideration. (Tr. at 84, 90). Claimant filed a request for an administrative hearing, (Tr. at 97), which was held on May 28, 2013, before the Honorable Andrew J. Chwalibog, Administrative Law Judge ("ALJ"). (Tr. at 27-55). By written decision dated June 26, 2013, the ALJ found that Claimant was not disabled as defined in the Social Security Act. (Tr. at 10-21). The ALJ's decision became the final decision of the Commissioner on March 11, 2014, when the Appeals Council denied Claimant's request for review. (Tr. at 1-3).

Claimant timely filed the present civil action seeking judicial review pursuant to 42 U.S.C. § 405(g). (ECF No. 1). The Commissioner subsequently filed an Answer opposing Claimant's complaint and a Transcript of the Administrative Proceedings. (ECF Nos. 5 & 6). Claimant then filed a Brief in Support of Judgment on the Pleadings, (ECF No. 7), and the Commissioner filed a Brief in Support of Defendant's Decision, (ECF No. 8). Consequently, the matter is fully briefed and ready for resolution.

## II.   <u>Claimant's Background</u>

Claimant was 50 years old at the time that he filed the instant application for benefits, and 51 years old on the date of the ALJ's decision. (Tr. at 21, 145). He has a

high school education and communicates in English. (Tr. at 173, 175). Claimant has previously worked as a preparation plant operator and foreman at a coal preparation plant. (Tr. at 175, 193).

## III.   <u>**Summary of ALJ's Decision**</u>

Under 42 U.S.C. § 423(d)(5), a claimant seeking disability benefits has the burden of proving a disability. *See Blalock v. Richardson,* 483 F.2d 773, 774 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

The Social Security Regulations establish a five-step sequential evaluation process for the adjudication of disability claims. If an individual is found "not disabled" at any step of the process, further inquiry is unnecessary and benefits are denied. 20 C.F.R. § 404.1520. The first step in the sequence is determining whether a claimant is currently engaged in substantial gainful employment. *Id.* § 404.1520(b). If the claimant is not, then the second step requires a determination of whether the claimant suffers from a severe impairment. *Id.* § 404.1520(c). If severe impairment is present, the third inquiry is whether this impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4 (the "Listing"). *Id.* § 404.1520(d). If the impairment does, then the claimant is found disabled and awarded benefits.

However, if the impairment does not meet or equal a listed impairment, the adjudicator must determine the claimant's residual functional capacity ("RFC"), which is the measure of the claimant's ability to engage in substantial gainful activity despite

the limitations of his or her impairments. *Id.* § 404.1520(e). After making this determination, the fourth step is to ascertain whether the claimant's impairments prevent the performance of past relevant work. *Id.* § 404.1520(f). If the impairments do prevent the performance of past relevant work, then the claimant has established a *prima facie* case of disability, and the burden shifts to the Commissioner to demonstrate, as the fifth and final step in the process, that the claimant is able to perform other forms of substantial gainful activity, when considering the claimant's remaining physical and mental capacities, age, education, and prior work experiences. 20 C.F.R. § 404.1520(g); *see also McLain v. Schweiker,* 715 F.2d 866, 868-69 (4th Cir. 1983). The Commissioner must establish two things: (1) that the claimant, considering his or her age, education, skills, work experience, and physical shortcomings has the capacity to perform an alternative job, and (2) that this specific job exists in significant numbers in the national economy. *McLamore v. Weinberger*, 538 F.2d 572, 574 (4th Cir. 1976).

When a claimant alleges a mental impairment, the SSA "must follow a special technique at every level in the administrative review," including the review performed by the ALJ. 20 C.F.R. § 404.1520a. First, the ALJ evaluates the claimant's pertinent signs, symptoms, and laboratory results to determine whether the claimant has a medically determinable mental impairment. *Id.* § 404.1520a(b). If such impairment exists, the ALJ documents his findings. Second, the ALJ rates and documents the degree of functional limitation resulting from the impairment according to criteria specified in 20 C.F.R. § 404.1520a(c). Third, after rating the degree of functional limitation from the claimant's impairment(s), the ALJ determines the severity of the limitation. A rating of "none" or "mild" in the first three functional areas (activities of daily living, social

functioning, and concentration, persistence or pace) and "none" in the fourth (episodes of decompensation) will result in a finding that the impairment is not severe unless the evidence indicates that there is more than minimal limitation in the claimant's ability to do basic work activities. *Id.* § 404.1520a(d)(1). Fourth, if the claimant's impairment is deemed severe, the ALJ compares the medical findings about the severe impairment and the rating and degree and functional limitation to the criteria of the appropriate listed mental disorder to determine if the severe impairment meets or is equal to a listed mental disorder. *Id.* § 404.1520a(d)(2). Finally, if the ALJ finds that the claimant has a severe mental impairment, which neither meets nor equals a listed mental disorder, the ALJ assesses the claimant's residual function. *Id.* § 404.1520a(d)(3).

Here, the ALJ determined as a preliminary matter that Claimant met the insured status for disability insurance benefits through December 31, 2015. (Tr. at 12, Finding No. 1). At the first step of the sequential evaluation, the ALJ confirmed that Claimant had not engaged in substantial gainful activity since May 1, 2010. (Tr. at 12, Finding No. 2). At the second step of the evaluation, the ALJ found that Claimant had the following severe impairments: "lumbar disc disease, adhesive capsulitis of the right shoulder status post rotator cuff repair, and osteoarthritis." (Tr. at 12, Finding No. 3). The ALJ considered Claimant's additional alleged impairments of GERD, depression, and anxiety. (Tr. at 12-13). However, the ALJ found these alleged impairments to be non-severe. (Tr. at 12-13).

Under the third inquiry, the ALJ found that Claimant did not have an impairment or combination of impairments that met or medically equaled any of the impairments contained in the Listing. (Tr. at 14-15, Finding No. 4). Accordingly, the ALJ determined that Claimant possessed:

5

> [T]he residual functional capacity to perform less than a full range of light
> work as defined in 20 CFR § 404.1567(b). The claimant requires a
> sit/stand option. He may only occasionally climb, balance, stoop, kneel,
> crouch, and crawl. He may only occasionally reach with the right upper
> extremity, which is non-dominant. He needs to avoid concentrated
> exposure to vibration and hazards.

(Tr. at 15-19, Finding No. 5). At the fourth step, the ALJ found that Claimant was unable to perform his past relevant work. (Tr. at 19, Finding No. 6). Under the fifth and final inquiry, the ALJ reviewed Claimant's past work experience, age, and education in combination with his RFC to determine his ability to engage in substantial gainful activity. (Tr. at 19-21, Finding Nos. 7-10). The ALJ considered that (1) Claimant was born in 1961 and was defined as younger individual age 18-49 on the alleged disability onset date, but subsequently changed age category to closely approaching advanced age; (2) he had at least a high school education and could communicate in English; and (3) transferability of job skills was not material to the disability determination because the Medical-Vocational Rules a finding that Claimant was "not disabled," regardless of his transferable job skills. (Tr. at 19, Finding Nos. 7-9). Given these factors, Claimant's RFC, and the testimony of a vocational expert, the ALJ concluded that Claimant could perform jobs that exist in significant numbers in the national economy, including work as an office helper, non-governmental mail clerk, or price marker at the light exertional level, and as a surveillance system monitor, inspector, or sorter at the sedentary exertional level. (Tr. at 19-21, Finding No. 10). Therefore, the ALJ found that Claimant was not disabled as defined in the Social Security Act, and was not entitled to benefits. (Tr. at 21, Finding No. 11).

## IV.   **Claimant's Challenges to the Commissioner's Decision**

Claimant raises two challenges to the Commissioner's decision. First, Claimant

asserts that the ALJ failed to fully develop the medical evidence related to Claimant's rotator cuff injury, osteoarthritis, and carpal tunnel syndrome. (ECF No. 7, at 11). According to Claimant, "given the absence of a full and complete development of the nature, location, and effect of [his] multiple medical problems," the ALJ could not properly analyze his impairments as required by the Regulations. (*Id.*) Interspersed in Claimant's criticism regarding the development of the record is a separate contention that the ALJ improperly "substituted opinions of the claimant's treating physicians for those of non-treating, record-reviewing state physicians." (*Id.*) Claimant insists that the ALJ "ignored" the opinions of his treating chiropractor, Rodney Thompson, D.C., and his treating physician, Gregory A. Carico, M.D. (*Id.*) In his second challenge, Claimant argues that "the ALJ failed to consider and properly evaluate [his] claim under the combination of impairments theory." (*Id.* at 12). Claimant contends that his "medical and mental problems," when considered in combination, support a finding of disability. (*Id.*) He asserts that the combination of his impairments meet or equal "the listing for disability." (*Id.*) In support of his contention, Claimant cites the RFC opinions provided by Dr. Thompson and Dr. Carico, along with the medical records from Stanley Tao, M.D., who treated Claimant for his rotator cuff injury. (*Id.* at 12-13). Within his second argument, Claimant again stealthily includes a criticism of the ALJ's consideration of the opinions of his treaters. (*Id.* at 13).

In response, the Commissioner maintains that the ALJ did not fail to develop the record and points out that Claimant had the burden to present evidence of his alleged disability. (ECF No. 8 at 6). In addition, the Commissioner asserts that "the record presents all the relevant facts and [Claimant's] attorney had the full opportunity to ask any questions and proffer any evidence desired." (*Id.* at 7). As for Claimant's intermixed

treating physician argument, the Commissioner avers that the ALJ properly evaluated the opinion evidence, and that the opinion evidence relied upon by Claimant is not supported by the medical record. (*Id.* at 7-9). For instance, with regard to Dr. Carico's RFC opinions, the Commissioner cites treatment records from Dr. Carico wherein he documented "only mild to moderate findings." (*Id.* at 7). Moreover, the Commissioner asserts that Claimant only visited Dr. Carico twice before the doctor formed his RFC opinion, which is an insufficient period of time for Dr. Carico to have developed a "longitudinal picture" of Claimant's impairments. (*Id.*) In relation to Dr. Thompson, the Commissioner stresses that Dr. Thompson is a chiropractor, and "thus, does not qualify as an acceptable medical source whose opinion is entitled to any weight." (*Id.* at 9). With respect to Claimant's second challenge, the Commissioner argues that there is no combination of impairments listing, and that Claimant has failed to identify any specific listing that his alleged impairments might meet. (*Id.*) Additionally, the Commissioner asserts that it is insufficient for Claimant to allege that he meets a listing on the basis that he cannot function at any job for eight hours each day. (*Id.* at 11).

## V.    <u>Relevant Medical History</u>

The undersigned has reviewed all of the evidence before the Court, including the records of Claimant's health care examinations, evaluations, and treatment. The relevant medical information is summarized as follows.

### A. Treatment Records

On March 15, 2005, Claimant underwent an MRI of his lumbar spine at Tri-State MRI in Huntington, West Virginia. (Tr. at 254). Charles M. Siegler, M.D., noted an "indication of remote back surgery with low back pain." (*Id.*) Dr. Siegler found an enhancing scar at L5-S1 on the left. (*Id.*) He observed that there was no recurrent disc

herniation seen, but there was a small central disc protrusion at L5-S1. (*Id.*) Claimant returned to Tri-State MRI over two years later, on May 7, 2007, for an MRI of the lumbar spine due to a history of lumbar surgery, and pain in his low back, both hips, and both legs. (Tr. at 253). Paul D. Akers, M.D., found this to be a stable examination with results similar to those obtained in March 2005. (*Id.*)

On July 17, 2007, Claimant was examined by David L. Weinsweig, M.D., at the Tri-State Neuroscience Center, Inc. (Tr. at 255). Dr. Weinsweig noted that Claimant had undergone successful lumbar surgery at L5-S1 in 1988. (*Id.*) Claimant had done well since the surgery until he sustained a head injury in 2006, which in turn caused significant lower back pain that radiated toward his neck and down the left leg posterolaterally into the calf. (*Id.*) Claimant also reported neck spasms as well as numbness in the right leg. (*Id.*) He was working at that time. (*Id.*) Upon examination, Dr. Weinsweig recorded that Claimant was in no acute distress. (*Id.*) Straight leg raise and hip rotation tests did not produce much discomfort. (*Id.*) Claimant exhibited grossly strong motor strength and diminished sensation to pain over the left foot. (*Id.*) His reflexes were equal. (*Id.*) Dr. Weinsweig observed that an MRI of the lumbar spine revealed degenerative disc disease at L5-S1 with some disc space narrowing, as well as mild bulging disc at the L5-S1 level and other areas of degenerative disc disease. (*Id.*) Dr. Weinsweig assessed Claimant with pain related to degenerative disc disease and determined that surgery would not be helpful. (*Id.*) Instead, Dr. Weinsweig suggested continued chiropractic care, which Claimant described as helping significantly. (Tr. at 256). However, Claimant also expressed his belief that he had plateaued with treatment. (*Id.*) Dr. Weinsweig offered the option of a pain clinic, which Claimant agreed to try. (*Id.*) Dr. Weinsweig ultimately opined that aggressive, conservative care would be the

9

best option for Claimant's current symptoms. (*Id.*)

Claimant treated with Thomas F. Scott, M.D., at the Scott Orthopedic Center on August 6, 2007. (Tr. at 334). Claimant reported left elbow pain, which began about ten months prior to the appointment, and swelling in both knees. (*Id.*) Dr. Scott's examination of the left elbow revealed positive tenderness globally, as well as positive tenderness at the lateral epicondyle. (*Id.*) X-rays of Claimant's knees showed no fractures, loose bodies, or tumors. (*Id.*) Dr. Scott assessed Claimant with epicondylitis, lateral, and chondromalacia patella. (*Id.*) Claimant received a Depo-Medrol injection in the left elbow. (*Id.*) He was advised to use ice and see a physical therapist for his knees. (*Id.*)

Claimant began seeing Rodney Thompson, D.C., for chiropractic treatment on April 9, 2010. (Tr. at 303). At his first visit with Dr. Thompson, Claimant reported that he was injured at work on March 19, 2010 when he was standing on a rubber mat that slipped out from under him, which caused him to fall onto his left wrist, right elbow, and bottom. (Tr. at 303). Since the fall, Claimant had experienced severe pain in his left wrist, right shoulder, neck, and mid to low back on both sides. (*Id.*) At his initial visit, Dr. Thompson recorded that flexion of the lumbar spine was painful at fifteen degrees and extension of the lumbar spine was painful at less than ten degrees. (Tr. at 302). Dr. Thompson also observed that Claimant experienced pain at less than ten degrees with left lateral bending and at ten degrees with right lateral bending. (*Id.*) Claimant reported vertebral tenderness at L1, L2, L3, L4, L5, and S1. (*Id.*) Dr. Thompson found that Claimant's straight leg raise test was positive at forty-five degrees for his right leg and positive at less than thirty-five degrees for his left leg. (*Id.*) A test of muscle strength on the right arm revealed +5 strength in elbow flexion and extension, wrist flexion and

10

extension, finger flexion, shoulder abduction, and shoulder shrug. (*Id.* at 301). Claimant exhibited pain in his cervical spine at ten degrees for right rotation, fifteen degrees for left rotation, ten degrees for right bending, less than ten degrees for left bending, fifteen degrees for flexion, and ten degrees for extension. (*Id.*) Dr. Thompson sent Claimant to obtain x-rays of his lumbar, cervical, and thoracic spine, right shoulder, and left wrist. (Tr. at 300). Claimant was instructed to follow-up in three days. (*Id.*)

On April 12, 2010, Claimant returned to Dr. Thompson. (Tr. at 299). He reported that his pain was an eight on a scale of zero to ten, and that his pain was made worse with most activities of daily living. (*Id.*) Dr. Thompson found that Claimant had restricted range of motion in his right shoulder and throughout his spine, with spasms generally occurring in Claimant's spinal region. (*Id.*) Dr. Thompson performed chiropractic manipulation and electrical muscle stimulation on Claimant's cervical, thoracic, lumbar, and sacral spine. (*Id.*) Claimant was told to return in two days. (*Id.*)

At the referral of Dr. Thompson, Claimant visited the Huntington Internal Medicine Group on April 15, 2010, for x-rays of his lumbar, cervical, and thoracic spine, right shoulder, and left wrist. (Tr. at 257-60). An x-ray of the lumbar spine revealed alignment without evidence of displaced fracture or subluxation. (Tr. at 257). James Watson, M.D., observed degenerative change with anterior osteophytosis as well as disc space narrowing at L4-5 and L5-S1, and facet arthropathy at L5-S1. (*Id.*) The cervical spine x-ray revealed grade I retrolisthesis of C3 on 4; however, no acute fracture was evident. (Tr. at 258). Dr. Watson found degenerative disc disease at C4-5 and C5-6 where mild bilateral neural foraminal narrowing also appeared. (*Id.*) The thoracic spine x-ray, as read by J. Alana Cochrane, M.D., showed normal vertebral alignment and disc space width. (Tr. at 437). Dr. Cochrane noted mild anterior osteophytosis in the low and

mid dorsal region; still, the x-ray was deemed unremarkable (*Id.*) The x-ray of Claimant's right shoulder showed no acute fracture or dislocation; however, Dr. Watson observed mild degenerative change to the acromioclavicular ("AC") joint. (Tr. at 259). Dr. Watson recorded no acute displaced fracture in the left wrist, but noted a widening of the scapholunate interval as might be seen in disruption of the scapholunate ligament. (Tr. at 260).

Claimant followed up with Dr. Thompson on April 16, 2010, at which time he reported a decrease in pain. (Tr. at 298). Claimant described his pain as a six out of ten, and informed Dr. Thompson that his pain increased with bending, lifting, carrying, reaching, and prolonged sitting. (*Id.*) Dr. Thompson observed bilateral lumbar spine hypertone, thoracic fixations, and bilateral middle cervical hypertone. (*Id.*) Dr. Thompson treated Claimant's cervical, thoracic, lumbar, and sacral spine with chiropractic manipulation and electric muscle stimulation. (*Id.*)

From April 19, 2010, to May 20, 2010, Claimant treated with Dr. Thompson thirteen more times. (Tr. at 283-97). Throughout that period, Dr. Thompson performed chiropractic manipulation, electric muscle stimulation, and manual therapy on Claimant's cervical, thoracic, lumbar, and sacral spine as well as his right shoulder and occasionally both wrists. (*Id.*) Claimant's pain level gradually decreased from a five out of ten to a three out of ten. (*Id.*) He often reported that reaching, bending, lifting, prolonged sitting, driving, and carrying exacerbated the pain. (*Id.*) At Claimant's May 20, 2010 appointment, Dr. Thompson recorded that Claimant's right side elbow flexion and extension, wrist flexion and extension, finger flexion, shoulder abduction, and shoulder shrug were "still weak," while his left side was +5. (Tr. at 284). Claimant's right shoulder continued to remain tender at the AC and glenohumeral joint space. (Tr. at

385). Dr. Thompson noted that Claimant's shoulder was still symptomatic for rotator cuff tear. (*Id.*) As for Claimant's left wrist, Dr. Thompson found that Claimant had eighty percent range of motion without pain. (*Id.*) On a cervical range of motion test, Claimant experienced pain at forty-five degrees right rotation, fifty degrees left rotation, twenty-five degrees right bending, twenty degrees left bending, thirty-five degrees flexion, and forty degrees extension. (Tr. at 284). With regard to Claimant's lumbar spine, a range of motion test revealed pain at twenty-five degrees flexion and at ten degrees extension, left lateral bending, and right lateral bending. (Tr. at 285). A straight leg raise test was positive at forty degrees for the right leg and positive at forty-five degrees for the left leg. (*Id.*) Dr. Thompson observed vertebral tenderness in Claimant's L3, L4, L5, and S1. (*Id.*) He performed a Logan Adjustment on Claimant's sacral, thoracic, and cervical spine along with a myofascial release of the lumbar spine and a manipulation of the right shoulder. (Tr. at 283). Dr. Thompson opined that Claimant's condition continued to improve in terms of pain-free range of motion and activities of daily living. (Tr. at 385).

On May 22, 2010, Claimant presented to St. Mary's Medical Center for an MRI of his right shoulder after being referred by Dr. Thompson. (Tr. at 261). No full thickness rotator cuff tear was observed. (*Id.*) However, the MRI revealed a superior labral tear, low-grade articular surface partial thickness tearing of the infraspinatus tendon, and AC arthrosis. (*Id.*)

Claimant visited Dr. Thompson an additional sixteen times from May 24, 2010, through July 12, 2010. (Tr. at 266-82, 386). Again, Claimant's pain gradually decreased from a five out of ten to a three out of ten. (*Id.*) Claimant often informed Dr. Thompson that his pain increased with prolonged sitting, bending, lifting, reaching, driving, or

climbing stairs. (*Id.*) At his June 14, 2010 appointment, Claimant reported that his shoulder "does better" with light activities, but worse with heavy lifting or mobility. (Tr. at 276). At his next appointment four days later, Claimant stated that he tried to use his riding lawnmower, but had to stop because it worsened his symptoms. (Tr. at 275). At a June 28, 2010 visit, Claimant indicated that his pain was a three out of ten. (Tr. at 270). Dr. Thompson recorded that Claimant experienced pain at thirty-five degrees flexion and fifteen degrees extension, left lateral bending, and right lateral bending on a lumbar range of motion test. (Tr. at 271). Dr. Thompson noted vertebral tenderness at L4, L5, and S1. (*Id.*) A straight leg raise test was positive on the right leg at sixty-five degrees and positive on the left leg at sixty degrees. (*Id.*) During a cervical range of motion test, Dr. Thompson observed pain at fifty-five degrees right rotation, sixty degrees left rotation, forty-five degrees right bending, forty degrees left bending, forty-five degrees flexion, and sixty-five degrees extension. (Tr. at 272). Claimant's elbow flexion and extension, wrist flexion and extension, finger flexion, shoulder abduction, and shoulder shrug on both sides were found to be four out of five or five out of five. (*Id.*) At his July 12, 2012 appointment, Claimant reported that his pain was a three out of ten. (Tr. at 266). Dr. Thompson noted right shoulder joint space tenderness, limited lumbar and sacral spine range of motion, lumbar spine hypertone, and some cervical spine hypertone. (*Id.*) From May 24, 2010, through July 12, 2010, Dr. Thompson treated Claimant's right shoulder and cervical, thoracic, lumbar, and sacral spine using chiropractic manipulation, electronic muscle stimulation, and manual therapy. (Tr. at 266-82, 386).

Claimant presented to Stanley Tao, M.D., on July 13, 2010, after being referred by Dr. Thompson for complaints of right shoulder pain. (Tr. at 332). Claimant described

his pain as worse with all activities and reported limited range of motion in his shoulder. (*Id.*) Dr. Tao observed that Claimant was oriented with normal affect and no neurological symptoms. (*Id.*) Dr. Tao's examination of the right shoulder revealed no swelling, atrophy, or winging. (*Id.*) He observed that Claimant's right shoulder strength was five out of five and that Claimant retained full range of motion with some pain present during abduction and external rotation. (*Id.*) Palpation over the right shoulder produced tenderness over the bicipital groove and subacromial space. (*Id.*) Dr. Tao recorded that Claimant's neck retained full range of motion, and the upper extremity examination was unremarkable. (*Id.*) Dr. Tao noted that an MRI of the right shoulder showed a possible SLAP (Superior Labrum from Anterior to Posterior) tear and partial rotator cuff tear. (Tr. at 333). Claimant was assessed with a SLAP lesion and rotator cuff sprain, strain, or tear. (*Id.*) Dr. Tao advised an injection to the right shoulder with the possibility of arthroscopic intervention in the future. (*Id.*)

Claimant returned to Dr. Thompson on July 19, 2010, and continued to treat with Dr. Thompson until July 30, 2010. (Tr. at 262-65). On July 30, 2010, Claimant reported his pain level as two out of ten. (Tr. at 262). He also indicated improved pain-free range of motion and increased activities of daily living. (*Id.*) Dr. Thompson recorded that Claimant had right shoulder joint space tenderness and limited range of motion in his cervical, thoracic, lumbar, and sacral spine. (*Id.*) Dr. Thompson performed chiropractic manipulation, electronic muscle stimulation, and manual therapy on Claimant's right shoulder and cervical, thoracic, lumbar, and sacral spine. (*Id.*) Claimant was released from Dr. Thompson's care, but was to return if his condition became acute. (*Id.*)

Claimant followed up with Dr. Tao on August 3, 2010 for his right shoulder. (Tr. at 330). At that time, workers' compensation had authorized the steroid injection

15

recommended by Dr. Tao at the July 2010 appointment. (*Id.*) Claimant reported to Dr. Tao that he saw improvement in his shoulder and declined the injection at this visit. (*Id.*) Upon examination, Dr. Tao noted that Claimant was oriented with a normal affect and no neurological symptoms. (*Id.*) Dr. Tao observed no swelling, atrophy, or winging of the right shoulder. (*Id.*) Claimant's right shoulder strength was five out of five with full range of motion. (*Id.*) Claimant continued to experience some pain with abduction and external rotation. (*Id.*) Dr. Tao's diagnosis remained the same, but he recorded that Claimant's condition overall was improving. (Tr. at 330-31).

On July 14, 2011, Claimant returned to Dr. Tao with complaints of pain on the dorsal and radial side of his left wrist with numbness and tingling in the thumb, index, and middle fingers. (Tr. at 325). Claimant also described increased pain in his right shoulder. (Tr. at 328). Upon examination, Claimant exhibited a normal gait and normal affect. (Tr. at 325, 328). He had full range of motion of the cervical spine along and a Spurling's test was negative. (Tr. at 325). No swelling, atrophy, or winging was observed in Claimant's right shoulder. (Tr. at 328). Strength in the right shoulder was intact, but Claimant exhibited tenderness over the bicipital groove and subacromial space. (*Id.*) Claimant retained full range of motion, experiencing some pain with abduction and external rotation. (*Id.*) Dr. Tao recorded that Claimant's right elbow retained active to passive range of motion with normal flexion and extension. (Tr. at 325). Claimant's left hand appeared normal with intact strength and non-tenderness to palpation. (*Id.*) An x-ray of the left wrist was normal. (Tr. at 326). However, Tinel's carpal canal test, Phalen's test, and a compression carpal tunnel test were all positive. (*Id.*) Dr. Tao assessed Claimant with carpal tunnel syndrome, joint pain of the hand, wrist sprain, a SLAP lesion, and rotator cuff sprain. (Tr. at 326, 329). Dr. Tao recommended treating

16

Claimant's carpal tunnel syndrome with a resting night brace and non-steroidal anti-inflammatory medication. (Tr. at 326). He also recommended that Claimant undergo a nerve conduction study. (*Id.*) As for Claimant's right shoulder, Dr. Tao again opined that a steroid injection should be administered. (Tr. at 329).

On September 26, 2011, Claimant treated with Dr. Tao for right shoulder pain. (Tr. at 323). He reported to Dr. Tao that the pain was located in the anterior and top of the shoulder. (*Id.*) Claimant indicated that the pain woke up him at night and was present during all activities. (*Id.*) Upon examination, Dr. Tao recorded that the right shoulder was tender over the bicipital groove and subacromial space. (*Id.*) Claimant's right shoulder strength was five out of five, and he retained full range of motion with some pain during abduction and external rotation. (*Id.*) Dr. Tao noted full range of motion in the neck, and that Claimant's cervical spine was non-tender on palpation with full range of motion. (Tr. at 323-24). Claimant was assessed with rotator cuff sprain, strain, or tear, and a SLAP lesion. (Tr. at 324). Dr. Tao prescribed Motrin 800 mg, and performed an injection of lidocaine and Kenalog to Claimant's right shoulder. (*Id.*)

Claimant next visited Dr. Tao on October 24, 2011. (Tr. at 321). He informed Dr. Tao that he felt no improvement from the shoulder injection and had received authorization from workers' compensation for surgery to his right shoulder. (*Id.*) Claimant's description of his right shoulder symptoms and pain remained the same, as did Dr. Tao's observations of the right shoulder. (Tr. at 321-22). Dr. Tao's assessment of Claimant's shoulder condition also remained unchanged, and Dr. Tao advised Claimant that he would proceed with arthroscopic intervention. (Tr. at 322).

On November 10, 2011, Dr. Tao performed surgery on Claimant's right shoulder. (Tr. at 304). Specifically, Dr. Tao performed a right shoulder arthroscopy with

arthroscopic acromioplasty and bursectomy, and an arthroscopic debridement, partial rotator cuff tear. (*Id.*) Dr. Tao indicated in the operative note that a prior MRI revealed a partial rotator cuff tear with a possible superior labral tear. (*Id.*) Dr. Tao also noted that non-operative treatment had been attempted, but Claimant had continued to remain symptomatic. (*Id.*) Claimant's post-operative diagnosis was a partial right rotator cuff tear. (*Id.*) The post-operative plan included post-impingement protocol, but no strengthening for three weeks. (Tr. at 305).

Mike Kennedy, Physical Therapist, informed Dr. Tao by letter dated November 14, 2011, of Claimant's treatment status. (Tr. at 339). Claimant appeared at his assessment with Mr. Kennedy without a sling. (*Id.*) Claimant denied symptoms distal to the elbow and reported that sensation to light touch was intact. (*Id.*) Mr. Kennedy noted that Claimant had full range of motion in his elbow, wrist, and fingers. (*Id.*) Mr. Kennedy observed that passive range of motion right shoulder flexion was 120 degrees with external rotation of thirty degrees. (*Id.*) Mr. Kennedy wrote that he planned to progress Claimant from passive range of motion to active range of motion activities, but strengthening would not begin for three to four weeks. (*Id.*)

On November 21, 2011, Claimant returned to Scott Orthopedic Center and was examined by Michael Riddle, PA-C. (Tr. at 319). Claimant reported doing well with no complaints. (*Id.*) Mr. Riddle's examination of Claimant's right shoulder revealed the surgical wound was healing well with no sign of infection. (*Id.*) Sensory and motor functions in the shoulder were intact. (*Id.*) Mild tenderness was present; however, Mr. Riddle observed that it was improving. (*Id.*) Mr. Riddle determined that Claimant's SLAP lesion was stable and his rotator cuff sprain, strain, or tear was doing well. (Tr. at 320). Claimant was advised to continue with physical therapy. (*Id.*)

18

Claimant returned to Dr. Tao on December 19, 2011, and reported that he was doing well with physical therapy until the inclusion of a strengthening program, which increased his shoulder pain.[1] (Tr. at 314). According to Claimant, the range of motion in his right shoulder was progressing well before the strengthening program began. (*Id.*) Dr. Tao observed that Claimant did not exhibit signs of distress. (*Id.*) Dr. Tao's examination of the right shoulder revealed diffuse pain upon palpation. (*Id.*) Forward flexion of Claimant's right shoulder was 165 degrees and external rotation was fifty-five degrees. (*Id.*) Active range of motion in the shoulder was limited due to pain. (*Id.*) Dr. Tao prescribed Ambien for treatment of the SLAP lesion. (*Id.*) He recommended a break from physical therapy in order for Claimant to rest. (Tr. at 315).

That same day, Mr. Kennedy informed Dr. Tao by letter that although Claimant had made progress, he recently began experiencing shoulder pain. (Tr. at 338). Claimant believed that a stretching activity caused irritation to his shoulder. (*Id.*) Mr. Kennedy stated that Claimant had not participated in any strengthening exercises for the past two sessions, but he continued to receive modalities. (*Id.*) Claimant's active flexion was tender at 155 degrees, and supraspinatus and external rotation was three out of five with tenderness. (*Id.*) Mr. Kennedy stated that Claimant would be continued on pain-free range of motion and modalities. (*Id.*)

On January 10, 2012, Claimant informed Dr. Tao that he was doing well, but still experiencing soreness when performing physical therapy. (Tr. at 355). Dr. Tao's observations of Claimant's right shoulder were identical to those recorded at the previous visit. (*Id.*) Dr. Tao noted that he was waiting for authorization from workers'

---

[1] The same day, Claimant provided Dr. Tao with a Residual Physical Functional Capacity Evaluation form. (Tr. at 318). However, Dr. Tao did not complete the form because he had not performed a functional capacity examination of Claimant. (Tr. at 318).

compensation to perform an injection on Claimant's shoulder. (Tr. at 356). Later that month, on January 31, Claimant again visited Dr. Tao. (Tr. at 353). Claimant asserted that he continued to experience shoulder pain. (*Id.*) Upon examination, Dr. Tao noted that palpation of the right shoulder produced more diffuse pain. (*Id.*) Forward flexion was 150 degrees, and external rotation was 35 degrees. (*Id.*) Dr. Tao recorded that internal rotation of the shoulder showed a loss of five levels, and active range of motion was limited due to pain. (*Id.*) There were no strength focal deficits. (*Id.*) Claimant was assessed with a sprained shoulder/arm, not otherwise specified; impingement syndrome, which was stable; and adhesive capsulitis. (Tr. at 353-54). Dr. Tao performed a Kenalog injection on Claimant's right shoulder, and he prescribed Ambien and ibuprofen 800 mg. (*Id.*)

Claimant followed up with Dr. Tao on February 23, 2012, reporting that the recent injection had helped his right shoulder pain; however, he was beginning to experience increased shoulder pain again at that time. (Tr. at 351). Dr. Tao's examination of the shoulder revealed less pain on palpation and that active range of motion was improved. (*Id.*) Forward flexion measured was 165 degrees and external rotation was 45 degrees. (*Id.*) Dr. Tao recorded an internal rotation loss of three levels. (*Id.*) His assessment of Claimant's condition remained the same, but he noted some improvement. (*Id.*) Dr. Tao recommended that Claimant continue physical therapy. (*Id.*)

Claimant next visited Dr. Tao on March 15, 2012, when he reported that his shoulder was still improving. (Tr. at 349). Claimant continued to exhibit normal gait, coordination, and affect. (*Id.*) Dr. Tao again recorded that Claimant experienced less pain on palpation of the right shoulder. (*Id.*) Forward flexion and external rotation in

the right shoulder were increased, and internal rotation loss remained the same. (*Id.*) Active range of motion in Claimant's right shoulder was improved, and he exhibited no focal deficits in strength. (*Id.*) Dr. Tao observed that Claimant's cervical spine had normal contour with no tenderness on palpation. (*Id.*) He opined that Claimant's adhesive capsulitis was stable and prescribed Ambien. (Tr. at 350).

On April 30, 2012, Claimant presented to Gregory A. Carico, M.D., with complaints of pain and stiffness in his joints at multiple locations, including his ankles, toes, and hands, but primarily complained of pain in his right shoulder. (Tr. at 438-39). Claimant denied any neck pain and stiffness. (Tr. at 438). Claimant informed Dr. Carico that his medications included a non-steroidal anti-inflammatory medication, Celexa, Ambien, Zanaflex, and Prilosec. (*Id.*) Dr. Carico diagnosed Claimant with anxiety, osteoarthritis, and insomnia. (Tr. at 439). Claimant was prescribed Celexa for his anxiety, Voltaren and a topical non-steroidal anti-inflammatory medication for his osteoarthritis, and Ambien and tizanidine for his insomnia. (Tr. at 439-40).

Claimant returned to Dr. Carico on July 25, 2012 for a physical RFC evaluation. (Tr. at 441). At that time, Claimant's active health issues included esophageal reflux and osteoarthritis at multiple sites. (*Id.*) Claimant described constant, throbbing, dull, and aching pain, including low back pain, that was alleviated by lying down or standing. (*Id.*) He informed Dr. Carico that his pain increased with walking, exercising, or sitting. (*Id.*) Claimant asserted that his pain caused sleep disturbances as well as an avoidance of recreation or work activities for at least the prior month. (*Id.*) He also stated that he was unable to walk for more than fifty feet, unable to stand for more than three minutes, and unable to sit for more than fifteen minutes. (Tr. at 442). Claimant denied any decrease in concentration, memory lapses or loss, motor disturbance, or sensory disturbance.

(*Id.*) Dr. Carico noted that Claimant had no prior psychiatric treatment. (*Id.*) Upon physical examination, Dr. Carico recorded that there was no tenderness to palpation of the supraspinatus, trapezius, and rhomboid muscles. (Tr. at 443). In addition, Dr. Carico observed that Claimant's cervical spine was normal in appearance with no sign of instability and no tenderness to palpation. (*Id.*) Dr. Carico also recorded that Claimant's cervical spine flexion and extension were normal. (*Id.*) He noted that Claimant's grooming and attention were both normal. (*Id.*) Ultimately, Dr. Carico assessed Claimant with backache, sciatica, and chronic pain syndrome. (Tr. at 443).

On March 6, 2013, Claimant again treated with Dr. Carico after complaining of a supraclavicular knot. (Tr. at 444). Dr. Carico assessed Claimant with a swelling, mass, or lump in the head and neck, and he ordered an x-ray of Claimant's cervical spine. (*Id.*) Frontal and lateral radiographs of Claimant's neck revealed bony structures and soft tissues that appeared to be within normal limits. (Tr. at 445).

### B. Evaluations and Opinions

#### 1. Mental Health Evaluations

On January 31, 2012, Claimant was evaluated by Emily E. Wilson, M.A., Licensed Psychologist, for the West Virginia Disability Determination Service. (Tr. at 340-43). Claimant informed Ms. Wilson that he was applying for benefits because of osteoarthritis and pain in his back, knees, wrist, elbows, and right shoulder. (Tr. at 340). Ms. Wilson also noted that Claimant's allegations included a torn rotator cuff, GERD, and anxiety. (Tr. at 341). Claimant reported increased anxiety and worry, which began in May 2010. (*Id.*) Claimant asserted that he was worried about not being able to work and support his family. (*Id.*) Claimant stated that his feelings of worry caused him to pick at the skin on his hand. (*Id.*) He told Ms. Wilson that the pain from his injury in

2006 caused depression, which fluctuated with his level of pain. (*Id.*) Claimant explained that he suffered from problems sleeping, weight gain, fatigue, problems with concentration and memory, nightmares, anger issues, bad or strange thoughts, and feelings of worthlessness, guilty, anxiety, and nervousness. (*Id.*) Ms. Wilson recorded that Claimant was no longer able to participate in past hobbies due to his pain. (*Id.*) As for past mental health treatment, Claimant indicated that he had attended three or four counseling sessions with Dr. Kenneth Devlin, who was a psychologist at a pain clinic. (*Id.*) In relation to his activities of daily living, Claimant stated that he performed self-care tasks, such as grooming, semi-independently, and he was able to shower on his own. (Tr. at 342). Sometimes Claimant's wife would help him put on his shoes. (*Id.*) Claimant explained that he could only perform very light chores, and he did not cook, but he was able to drive. (*Id.*) Claimant and his wife handled the finances together. (*Id.*) Claimant's typical day consisted of lying on the couch, and he stated that he does not participate in any past hobbies or social activities. (*Id.*) Claimant reported that his medications at the time of the evaluation included ibuprofen 800 mg, Ambien, Prilosec, and Prevacid. (*Id.*)

Upon mental status examination, Ms. Wilson observed that Claimant had good grooming and hygiene. (*Id.*) Claimant's posture appeared slightly slumped and his gait was slow. (*Id.*) Claimant frequently turned and twisted while seated as if he was uncomfortable. (*Id.*) Ms. Wilson recorded that Claimant was cooperative and interacted appropriately with her. (*Id.*) Claimant's eye contact was fair, and his verbal responses were adequate, appropriate, relevant, and coherent. (*Id.*) Ms. Wilson found that Claimant's mood was appropriate and his affect was restricted. (*Id.*) Claimant's judgment, thought process, thought content, and perception were all within normal

limits, and his insight was adequate. (*Id.*) Ms. Wilson determined that Claimant's immediate memory was mildly deficient based on his ability to immediately recall only three of four words, his recent memory was moderately deficient based on his ability to only recall two out of four words after a five-minute delay, and his remote memory was within normal limits. (Tr. at 342-43). Claimant's concentration, persistence, and pace were all within normal limits. (Tr. at 343). Based on Claimant's reported symptoms and history, Ms. Wilson diagnosed Claimant with adjustment disorder with features of depression and anxiety. (*Id.*) She opined that Claimant's prognosis was good if he could obtain consistent, appropriate psychotropic and psychological intervention. (*Id.*) She also concluded that Claimant could manage his finances if awarded benefits. (*Id.*)

On February 16, 2012, Timothy Saar, Ph.D., completed a Psychiatric Review Technique. (Tr. at 59-61). Dr. Saar opined that Claimant suffered from affective disorders and anxiety related disorders, but found that these disorders were non-severe. (Tr. at 59-60). Dr. Saar determined that Claimant had mild limitation in maintaining social functioning and maintaining concentration, persistence, or pace, but no limitation in activities of daily living. (Tr. at 60). He also observed that Claimant had no episodes of decompensation of extended duration. (*Id.*) Accordingly, Dr. Saar indicated that Claimant did not meet the paragraph B criteria for Listings 12.04 or 12.06. (*Id.*) He further concluded that the paragraph C criteria for Listings 12.04 and 12.06 were not met. (*Id.*) Dr. Saar found that Claimant's statements as to intensity, persistence, and functional limitations were not substantiated by objective medical evidence. (Tr. at 60-61). He opined that Claimant was only partially credible with regard to the severity of his mental issues based on Claimant's activities of daily living and the medical evidence of record. (Tr. at 61). On April 19, 2012, after reviewing all of the record evidence, John

24

Todd, Ph.D., affirmed the Psychiatric Review Technique completed by Dr. Saar. (Tr. at 71-72).

### 2. Physical Evaluations

On March 26, 2012, Dr. Thompson completed a Physical Residual Functional Capacity Evaluation form. (Tr. at 408). On the subject of exertional limitations, Dr. Thompson opined that Claimant could occasionally lift or carry ten pounds, frequently lift or carry less than ten pounds, stand or walk less than two hours, and sit for four hours in an eight-hour day. (*Id.*) He also asserted that Claimant would have to alternate between sitting and standing every thirty minutes. (*Id.*) Dr. Thompson also noted that Claimant had limited ability to push or pull with his upper extremities. (*Id.*) Regarding postural limitations, Dr. Thompson determined that Claimant could never perform balancing, stooping, kneeling, crouching, crawling, or climbing of ramps, stairs, ladders, ropes, or scaffolds. (*Id.*) As for manipulative restrictions, Dr. Thompson concluded that Claimant was limited in his abilities to reach in all directions and handle, but unlimited in his abilities of fingering and feeling. (*Id.*) With regard to communicative or environmental limitations, Dr. Thompson opined that none were established. (*Id.*)

On April 19, 2012, Robert B. Walker, M.D., performed an Independent Medical Examination in regard to Claimant's workers' compensation claim. (Tr. at 410-17). Claimant reported limited range of motion in his right shoulder as well as mild right lower back pain with muscle spasm, which extended to the left hip causing numbness in his hip and left toes. (Tr. at 410). In discussing his activities of daily living, Claimant informed Dr. Walker that he required assistance getting in and out of the tub, which limited him to taking showers; had difficulty combing his hair or shaving due to pain in his right hand; needed help putting on his pants and tucking in his shirt; and could only

ride in or drive a car for short periods of time. (Tr. at 411). Claimant stated that he had problems with his hands in grasping, pinching, dropping objects, and performing activities that require the exertion of hand strength. (*Id.*) He also described diminished sensation in his hands. (*Id.*) In addition, Claimant reported that he had problems standing, sitting, walking, climbing stairs, stooping, squatting, reaching, lifting, and exercising. (*Id.*) Claimant stated that his hobbies and sleep were both affected by his pain. (*Id.*) At the time of the examination, Claimant's medications included ibuprofen, Ambien, and Prilosec. (*Id.*)

Upon physical examination of Claimant's right shoulder, Dr. Walker recorded that flexion was eighty-five degrees, extension was thirty-five degrees, abduction was seventy-five degrees, adduction was forty degrees, internal rotation was forty-five degrees, and external rotation was forty degrees. (*Id.*) For comparison purposes, Dr. Walker noted that left shoulder flexion was 170 degrees, extension was seventy degrees, abduction was 150 degrees, adduction was seventy degrees, and internal and external rotation were both ninety degrees. (*Id.*) Dr. Walker also examined Claimant's left wrist and found that flexion was fifty degrees and extension was forty degrees. (Tr. at 415). In addition to examining Claimant's shoulder and wrist, Dr. Walker reviewed medical records from Claimant's treatment with Dr. Thompson and Dr. Tao. (Tr. at 411-12). In his summary, Dr. Walker opined that Claimant had active, but stable, symptoms and had achieved maximum medical improvement from his work injury. (Tr. at 413). Dr. Walker indicated that Claimant would require, at most, two more appointments with an orthopedist in order to finalize a post-treatment plan due to persistent symptoms; however, he believed Claimant would not require further treatment beyond those visits. (*Id.*) Claimant was assigned a nine percent whole person impairment related to the right

shoulder injury. (*Id.*) Dr. Walker concluded that Claimant should be able to return to work as a foreman or in a similar position with certain limitations, which were contained in Dr. Walker's Physician Statement of Physical Capabilities form. (*Id.*) On that form, Dr. Walker listed Claimant's diagnoses as right rotator cuff tear, left wrist sprain, and sprain or strain of the cervical, thoracic, and lumbar spine regions. (Tr. at 417). Dr. Walker determined that, in an eight-hour workday, Claimant could sit for eight hours with periods of rest, stand for seven hours with periods of rest, and walk for two hours. (*Id.*) He also indicated that Claimant could perform repetitive actions of simple grasping with both hands, but he was only able to repetitively push and pull with his left hand.[2] (*Id.*) In addition, Dr. Walker opined that Claimant could perform the repetitive actions necessary to operate foot controls or a motor vehicle with his right leg only. (*Id.*) As for other limitations, Dr. Walker found that Claimant could frequently lift ten pounds or less; occasionally lift up to forty pounds, push or pull objects weighing less than thirteen pounds, bend, twist, turn, type, and drive an automatic vehicle; and never squat, kneel, climb, crawl, reach above shoulder height, or drive a standard vehicle. (*Id.*) Dr. Walker noted that, with the above limitations, Claimant could be released back to work as of the date of the examination. (*Id.*)

On May 9, 2012, William E. Waltrip, M.D., performed an Internal Medicine Examination for the West Virginia Disability Determination Service. (Tr. at 421-26). Dr. Waltrip noted that Claimant alleged he suffered from a shoulder injury, torn rotator cuff, GERD, anxiety, herniated discs, two bulging discs, and osteoarthritis of the back, shoulders, elbows, left wrist, hands, knees, and ankles. (Tr. at 421). Claimant informed

---

[2] Dr. Walker recorded that Claimant was right hand dominant. (Tr. at 417). However, a number of medical records reveal that Claimant is left hand dominant. (Tr. at 306, 323, 325, 330, 332, 339, 422).

Dr. Waltrip that he had not sought professional advice regarding his anxiety. (*Id.*) In relation to his history of back pain, Claimant relayed that his back pain began in 1988 and that he eventually underwent surgery on his back, which provided substantial relief until he reinjured his back after falling at work in 2010. (*Id.*) Claimant reported constant pain radiating into his left lower extremity, which prevented him from walking more than one or two blocks and performing certain activities, such as chores or grocery shopping. (*Id.*) Claimant also asserted that he could only stand for fifteen minutes and had to change position frequently while seated. (*Id.*) At that time, Claimant's back was being treated with pain medications, and no further surgery had been recommended to him. (Tr. at 422). On the subject of his right shoulder injury, Claimant told Dr. Waltrip that he had surgery to repair a torn rotator cuff and labral tear in the shoulder, which provided him some relief from symptoms, but he still had difficulty reaching above his head. (*Id.*) Claimant further indicated that his left wrist was injured in 2010 and that he had pain when moving his left wrist. (*Id.*) In addition, Claimant described degenerative arthritis in his knees and ankles, but reported that he had not sought any recent medical advice for those conditions. (*Id.*) At the time of the examination, Claimant reported that his medications consisted of diclofenac, Zanaflex, Celexa, and Ambien. (*Id.*)

Upon physical examination, Dr. Waltrip found that Claimant's neck had full range of motion. (Tr. at 423). Claimant's extremities were nontender and did not exhibit signs of muscle mass or tone loss. (*Id.*) Dr. Waltrip recorded that Claimant's back was nontender and did not display any sign of spasm. (*Id.*) Claimant had limited flexion and extension of his lumbar spine, and he experienced discomfort as to both flexion and extension at forty-five degrees. (*Id.*) In relation to Claimant's right shoulder, Dr. Waltrip observed that flexion and abduction of the shoulder were limited to ninety degrees. (*Id.*)

Dr. Waltrip's examination of Claimant's joints revealed no deformity, heat, redness, or tenderness. (*Id.*) Dr. Waltrip indicated that Claimant was able to make a fist and perform fine manipulations without limitation. (*Id.*) Claimant also demonstrated good grip strength. (*Id.*) Dr. Waltrip observed that Claimant walked with a normal gait, and no loss of motor strength or sensation to fine touch was apparent. (*Id.*) Claimant was able to walk heel to toe and tandem; however, he refused to knee squat and could not walk on the tip of his toes and heels. (*Id.*) Claimant's deep tendon reflexes were present and normal. (*Id.*)

Dr. Waltrip diagnosed Claimant with chronic back pain, status post arthroscopic surgical repair of torn rotator cuff and labral tear of the right shoulder, left wrist pain secondary to degenerative arthritis, degenerative arthritis of the knees and ankles, and GERD. (Tr. at 423-24). Dr. Waltrip determined that Claimant's back and knee pain did limit his ability to walk and stand for protracted periods; however, he felt Claimant should be able to accomplish both in moderation. (Tr. at 424). Dr. Waltrip further concluded that Claimant would be capable of lifting a moderately heavy object. (*Id.*) In addition, Dr. Waltrip recorded that Claimant possessed no hearing, sight, or speech limitations, and Claimant exhibited no motor dysfunction, sensory loss, or reflex abnormalities. (*Id.*)

On May 23, 2012, Pedro F. Lo, M.D., completed a Physical RFC Assessment regarding Claimant's functional limitations. (Tr. at 73-75). Dr. Lo indicated that Claimant suffered from chronic back pain and right shoulder pain. (Tr. at 75). With regard to exertional limitations, Dr. Lo found that Claimant could occasionally lift or carry twenty pounds, frequently lift or carry ten pounds, and stand, walk, or sit with normal breaks for six hours in an eight-hour work day. (Tr. at 73). Dr. Lo also indicated

that Claimant would have to periodically alternate sitting and standing to relieve pain and discomfort in his knees and back. (*Id.*) He determined that Claimant had unlimited ability to push and pull, including operation of hand and foot controls. (*Id.*) As for postural limitations, Dr. Lo concluded that Claimant could occasionally balance, stoop, kneel, crouch, crawl, and climb ramps, stairs, ladders, ropes, and scaffolds. (Tr. at 73-74). In relation to manipulative limitations, Dr. Lo determined that Claimant was limited in reaching in any direction, including overhead and in front or laterally on the right side, as a result of his limited right shoulder range of motion. (Tr. at 74). However, Claimant possessed unlimited ability in handling, fingering, and feeling. (*Id.*) Additionally, Dr. Lo opined that Claimant had no visual or communicative limitations. (*Id.*) As for any environmental limitations, Dr. Lo found that found that Claimant could have unlimited exposure to extreme cold, extreme heat, wetness, noise, fumes, odors, dusts, gases, and poor ventilation. (Tr. at 74-75). However, Dr. Lo asserted that Claimant should avoid concentrated exposure to vibration and hazards, such as machinery or heights. (Tr. at 75). Dr. Lo ultimately characterized Claimant's physical RFC as light with the additional limitations noted in the Physical RFC Assessment form. (*Id.*)

On July 25, 2012, Dr. Carico completed a Residual Physical Functional Capacity Evaluation form. (Tr. at 432). He listed Claimant's primary diagnoses as osteoarthritis and rheumatoid arthritis, and secondary diagnoses as depression and GERD. (*Id.*) On the subject of exertional limitations, Dr. Carico found that Claimant could occasionally or frequently lift or carry less than ten pounds, stand or walk for two hours, and sit less than two hours in an eight-hour work day. (*Id.*) On the section of the form asking if Claimant would need to alternate sitting and standing, Dr. Carico wrote "very limited."

(*Id.*) In addition, Dr. Carico determined that Claimant was "limited" in pushing or pulling with both his upper and lower extremities. (*Id.*) As for postural limitations, Dr. Carico concluded that Claimant could never balance, stoop, kneel, crouch, crawl, or climb ramps, stairs, ladders, ropes, and scaffolds. (*Id.*) With regard to manipulative limitations, Dr. Carico opined that Claimant was "limited" in handling, fingering, and reaching in all directions. (*Id.*) Additionally, Dr. Carico asserted that Claimant had limitation with respect to his hearing as a result of tinnitus. (*Id.*) As for environmental limitations, Dr. Carico opined that Claimant should avoid concentrated exposure to extreme cold, extreme heat, wetness, humidity, vibration, fumes, odors, hazards, machinery, and heights. (*Id.*)

## VI.   <u>Scope of Review</u>

The issue before the Court is whether the final decision of the Commissioner is based upon an appropriate application of the law and is supported by substantial evidence. *See Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). In *Blalock v. Richardson,* the Fourth Circuit Court of Appeals defined "substantial evidence" to be:

> [E]vidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

483 F.2d 773, 776 (4th Cir. 1973) (quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966)). When examining the Commissioner's decision, the Court does not conduct a *de novo* review of the evidence to ascertain whether the claimant is disabled. *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (citing *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996)). Instead, the Court's role is limited to insuring that the ALJ followed applicable Regulations and Rulings in reaching his decision, and that the decision is

supported by substantial evidence. *Hays*, 907 F.2d at 1456. If substantial evidence exists, the Court must affirm the Commissioner's decision "even should the court disagree with such decision." *Blalock*, 483 F.2d at 775.

## VII.   Discussion

### A. Duty to Develop the Record

Claimant contends that the ALJ failed to fully develop the record with regard to his rotator cuff injury, osteoarthritis, and carpal tunnel syndrome. (ECF No. 7 at 11). According to Claimant, "given the absence of a full and complete development of the nature, location, and effect of [his] multiple medical problems," the ALJ could not properly analyze his impairments as required by the Regulations. (*Id.*) Having reviewed the record in full, the undersigned finds that this argument lacks merit.

Certainly, an ALJ has the duty to fully and fairly develop the record. *See Cook v. Heckler*, 783 F.2d 1168, 1173 (4th Cir. 1986). However, an ALJ is not required to act as a claimant's counsel. *Bell v. Chater*, 57 F.3d 1065, 1995 WL 347142, at *4 (4th Cir. June 9, 1995) (unpublished table decision) (citing *Clark v. Shalala,* 28 F.3d 828, 830-31 (8th Cir. 1994)). The ALJ has the right to presume that a claimant's counsel presented the strongest case for benefits. *Nicholson v. Astrue,* 341 F. App'x 248, 253 (7th Cir. 2009) (citing *Glenn v. Sec'y of Health & Human Servs.*, 814 F.2d 387, 391 (7th Cir. 1987)). Ultimately, "[a]lthough the ALJ has the duty to develop the record, such a duty does not permit a claimant, through counsel, to rest on the record ... and later fault the ALJ for not performing a more exhaustive investigation." *Maes v. Astrue*, 522 F.3d 1093, 1097 (10th Cir. 2008).

Indeed, "[a]n ALJ's duty to develop the record further is triggered only when there is ambiguous evidence or when the record is inadequate to allow for proper

evaluation of the evidence." *Mayes v. Massanari*, 276 F.3d 453, 459-60 (9th Cir. 2001). When considering the adequacy of the record, a court must look for evidentiary gaps that result in "unfairness or clear prejudice" to the claimant. *Brown v. Shalala,* 44 F.3d 931, 935 (11th Cir. 1995). A remand is not warranted every time a claimant alleges that the ALJ failed to fully develop the record. *Id.* at 935 (finding that remand is appropriate when the absence of available documentation creates the likelihood of unfair prejudice to the claimant). In other words, remand is improper, "unless the claimant shows that he or she was prejudiced by the ALJ's failure. To establish prejudice, a claimant must demonstrate that he or she could and would have adduced evidence that might have altered the result." *Carey v. Apfel*, 230 F.3d 131, 142 (5th Cir. 2000).

In this case, Claimant, who was represented by counsel at his administrative hearing, has failed to identify any evidentiary gaps in the record. *See Nye v. Colvin*, No. 3:13-12115, 2014 WL 2893199, at *20 (S.D.W.Va. June 26, 2014) (rejecting identical argument where claimant did not identify evidentiary gaps). Furthermore, he has entirely neglected to proffer what evidence could have been adduced that might have changed the result of the proceedings. *See Scarberry v. Chater*, 52 F.3d 322, 1995 WL 238558, at *4 n.13 (4th Cir. Apr. 25, 1995) (unpublished table decision) (rejecting failure to develop record argument where claimant did not "identify what the missing evidence would have shown"). The ALJ reviewed Claimant's extensive medical records, scrutinized the opinions of Claimant's treaters, obtained multiple physical and mental assessments from agency experts, and considered Claimant's testimony. *See Toney v. Shalala*, 35 F.3d 557, 1994 WL 463427, at *2 (4th Cir. Aug. 29, 1994) (unpublished table decision) (holding record was adequately developed where ALJ considered examination reports, medical opinions, claimant's testimony, medical records, and vocational expert

33

testimony). The medical records and opinion evidence considered by the ALJ certainly encompassed Claimant's allegations related to his right shoulder, osteoarthritis, and carpal tunnel syndrome.[3] (Tr. at 13-15, 17-19). Claimant's argument boils down to circular logic—the record could not have been well-developed because his application for benefits was denied, and his application was denied because the record was incomplete. That will not suffice for remand. Ultimately, the record was well-developed and certainly provided more than adequate information upon which the ALJ could properly evaluate Claimant's application for benefits. An adverse decision alone does not entitle Claimant to a remand for further factual development. Accordingly, the undersigned **FINDS** that the ALJ did not err in failing to more fully develop the record.

### B. The ALJ's Evaluation of Opinion Evidence

As mentioned above, interspersed in Claimant's development of the record argument is a separate contention that the ALJ improperly "substituted opinions of the claimant's treating physicians for those of non-treating, record-reviewing state physicians," in violation of applicable law. (ECF No. 7 at 11). More particularly, Claimant asserts that the ALJ ignored the opinions of Dr. Thompson and Dr. Carico as to Claimant's physical limitations. (*Id.*)

When evaluating a claimant's application for disability benefits, the ALJ "will always consider the medical opinions in [the] case record together with the rest of the relevant evidence [he] receives." 20 C.F.R. § 404.1527(b). Medical opinions are defined as "statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of [a claimant's] impairment(s),

---

[3] Claimant was diagnosed with carpal tunnel syndrome by Dr. Tao in July 2011. (Tr. at 326). At that visit, Dr. Tao recommended that Claimant undergo a nerve conduction study. (*Id.*) However, that is the only document in the record that mentions carpal tunnel syndrome as a diagnosis, which includes medical records from multiple subsequent appointments with Dr. Tao.

including [his] symptoms, diagnosis and prognosis, what [he] can still do despite [his] impairment(s), and [his] physical or mental restrictions." *Id.* § 404.1527(a)(2). Title 20 C.F.R. § 404.1527(c) outlines how the opinions of accepted medical sources will be weighed in determining whether a claimant qualifies for disability benefits. In general, the SSA gives more weight to the opinion of an examining medical source than to the opinion of a non-examining source. *See* 20 C.F.R. § 404.1527(c)(1). Even greater weight is allocated to the opinion of a treating physician, because that physician is usually most able to provide "a detailed, longitudinal picture" of a claimant's alleged disability. *Id.* § 404.1527(c)(2). Indeed, the "treating physician rule" requires a treating physician's opinion to be given controlling weight when the opinion is supported by clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence. *Id.* If the ALJ determines that a treating physician's opinion is not entitled to controlling weight, the ALJ must then analyze and weigh all the medical opinions of record, taking into account certain factors[4] listed in 20 C.F.R. § 404.1527(c)(2)-(6), and must explain the reasons for the weight given to the opinions. "Adjudicators must remember that a finding that a treating source medical opinion is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with other substantial evidence in the case record means only that the opinion is not entitled to 'controlling weight,' not that the opinion should be rejected. ... In many cases, a treating source's opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight." Social Security Ruling ("SSR") 96-2p, 1996 WL 374188, at *4. Nevertheless, a treating physician's opinion may be rejected in

---

[4] The factors include: (1) length of the treatment relationship and frequency of evaluation, (2) nature and extent of the treatment relationship, (3) supportability, (4) consistency, (5) specialization, and (6) other factors bearing on the weight of the opinion.

whole or in part when there is persuasive contrary evidence in the record. *Coffman v. Bowen,* 829 F.2d 514, 517 (4th Cir. 1987). Ultimately, it is the responsibility of the ALJ, not the court, to evaluate the case, make findings of fact, weigh opinions, and resolve conflicts of evidence. *Hays*, 907 F.2d at 1456.

Medical source statements on issues reserved to the Commissioner, however, are treated differently than other medical source opinions. SSR 96-5p, 1996 WL 374183. In both the Regulations and SSR 96-5p, the SSA explains that "some issues are not medical issues regarding the nature and severity of an individual's impairment(s) but are administrative findings that are dispositive of a case; i.e., that would direct the determination or decision of disability;" including the following:

> 1. Whether an individual's impairment(s) meets or is equivalent in severity to the requirements of any impairment(s) in the listings;
>
> 2. What an individual's RFC is;
>
> 3. Whether an individual's RFC prevents him or her from doing past relevant work;
>
> 4. How the vocational factors of age, education, and work experience apply; and
>
> 5. Whether an individual is "disabled" under the Act.

*Id.* at *2. "The regulations provide that the final responsibility for deciding issues such as these is reserved to the Commissioner." *Id.* As such, a medical source statement on an issue reserved to the Commissioner is never entitled to controlling weight or special significance, because "giving controlling weight to such opinions would, in effect, confer upon the [medical] source the authority to make the determination or decision about whether an individual is under a disability, and thus would be an abdication of the Commissioner's statutory responsibility to determine when an individual is disabled."

*Id.* at *2. Still, these opinions must always be carefully considered, "must never be ignored," and should be assessed for their supportability and consistency with the record as a whole. *Id.* at *3.

It is also important to note that the treating physician rule only applies to "acceptable medical sources." SSR 06-03P, 2006 WL 2329939, at *2; *see, e.g.*, *Bushey v. Colvin*, 552 F. App'x 97, 97 (2d Cir. 2014) (holding "treating source rule" does not apply to physician assistant because physician assistant is not "acceptable medical source"). Under the Regulations, "acceptable medical sources" include licensed physicians and licensed psychologists, and for the purpose of establishing certain impairments, include licensed optometrists, licensed podiatrists, and qualified speech-language pathologists. 20 C.F.R. § 404.1513(a). On the other hand, chiropractors, such as Dr. Thompson, are not considered "acceptable medical sources," and thus, their opinions are not subject to the treating physician rule. *Id.* § 404.1513(d).

Nevertheless, the Commissioner may use evidence from other sources "to show the severity of the individual's impairment(s) and how it affects the individual's ability to function." SSR 06-03P, 2006 WL 2329939, at *2; *see also* 20 C.F.R. § 404.1513(d). Social Security Ruling 06-03P sets forth the SSA's policy on how opinion evidence from medical sources that are not acceptable sources and non-medical sources should be considered on the issue of disability. The Ruling makes a distinction between types of "other sources," noting that there are health care providers, who are not "acceptable medical sources," but treat the claimant's medical conditions, and there are non-medical sources, like teachers and rehabilitation counselors, who spend substantial time with the claimant in a professional capacity. As the Ruling explains, both types of sources may provide relevant evidence and have useful opinions:

> With the growth of managed health care in recent years and the emphasis on containing medical costs, medical sources who are not "acceptable medical sources," such as nurse practitioners, physician assistants, and licensed clinical social workers, have increasingly assumed a greater percentage of the treatment and evaluation functions previously handled primarily by physicians and psychologists. Opinions from these medical sources, who are not technically deemed "acceptable medical sources" under our rules, are important and should be evaluated on key issues such as impairment severity and functional effects, along with the other relevant evidence in the file.

> "Non-medical sources" who have had contact with the individual in their professional capacity, such as teachers, school counselors, and social welfare agency personnel who are not health care providers, are also valuable sources of evidence for assessing impairment severity and functioning. Often, these sources have close contact with the individuals and have personal knowledge and expertise to make judgments about their impairment(s), activities, and level of functioning over a period of time.

2006 WL 2329939, at *3. The Ruling additionally provides guidance on how the opinions of these other sources should be weighed, stating that the ALJ should consider the same factors that apply to the opinions of "acceptable medical sources," including: (1) the length of time the source has known the claimant and the frequency of their contact; (2) the consistency of the source's opinion with the other evidence; (3) the degree to which the source provides supportive evidence; (4) how well the source explains his or her opinion; (5) whether the source has an area of specialty or expertise related to the claimant's impairments; and (6) any other factors tending to support or refute the opinion. *Id.* at *4. Not every factor applies in every case, and "[e]ach case must be adjudicated on its own merits based on a consideration of the probative value of the opinions and a weighing of all the evidence in that particular case." *Id.* at *5.

Furthermore, the Ruling discusses how the ALJ should address other source opinions in the written decision, indicating that "the case record should reflect the ***consideration*** of opinions from medical sources who are not 'acceptable medical

sources' and from 'non-medical sources' who have seen the claimant in their professional capacity." *Id.* at *6 (emphasis added). However, the Ruling acknowledges that "there is a distinction between what an adjudicator generally must consider and what the adjudicator must explain in the disability determination." *Id.* In general, an ALJ "should explain the weight given to opinions from these 'other sources,' or otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the adjudicator's reasoning, *when such opinions may have an effect on the outcome of the case." Id.* at *6 (emphasis added). The Ruling requires the ALJ to apply a common sense standard. For example, in an atypical case, when an "other source" opinion is given more weight than a "treating physician" opinion, and the decision is not fully favorable to the claimant, the ALJ **must** explain the reasons for the weight given to the two opinions. *Id.* On the other hand, the Ruling implicitly allows the ALJ leeway not to discuss an opinion from an "other source" that is duplicative or cumulative of opinions already addressed in the decision, that is tangential to the outcome, or that is integrated or adopted in another opinion explicitly weighed by the ALJ. *See, e.g., Love-Moore v. Colvin,* No. 7:12–CV–104–D, 2013 WL 5366967, at *11 (E.D.N.C. Aug. 30, 2013) (holding that "the language in SSR 06–03p regarding what must be spelled out in the ALJ's opinion is more precatory than mandatory.") This interpretation of the Ruling is consistent with the general principle that although the ALJ is required to consider all of the evidence submitted on behalf of a claimant, "[t]he ALJ is not required to discuss all evidence in the record." *Aytch v. Astrue,* 686 F. Supp. 2d 590, 602 (E.D.N.C. 2010); *see also Dyer v. Barnhart,* 395 F.3d 1206, 1211 (11th Cir. 2005) (explaining there "is no rigid requirement that the ALJ specifically refer to every piece of evidence in his decision"). Indeed, "[t]o require an

ALJ to refer to every physical observation recorded regarding a Social Security claimant in evaluating that claimant's ... alleged condition[s] would create an impracticable standard for agency review, and one out of keeping with the law of this circuit." *White v. Astrue*, No. 2:08-CV-20, 2009 WL 2135081, at *4 (E.D.N.C. July 15, 2009).

First, Claimant argues that the ALJ ignored Dr. Carico's opinion that Claimant should never climb, balance, stoop, kneel, crouch, or crawl, and that he was limited in reaching in all directions and handling objects. (ECF No. 7 at 11; Tr. at 432). As an "acceptable medical source," Dr. Carico's opinions were analyzed under 20 C.F.R. § 404.1527(c). (Tr. at 15). Notwithstanding, the ALJ assigned little weight to Dr. Carico's opinions because the limitations he provided were "overly restrictive and the evidence of record, including Dr. Carico's own treatment notes, d[id] not support his assessment of less than sedentary work activity." (Tr. at 18). The ALJ elaborated that the diagnostic and clinical evidence of record only revealed "mild to moderate findings." (*Id.*) He also recognized that, other than the two successful surgical procedures that Claimant underwent in 1988 and 2011, Claimant's treatment was relatively conservative, which included medication management and home remedies, such as ice packs. (Tr. at 17). In support of his assessment, the ALJ specifically cited a 2007 MRI of Claimant's lumbar spine; 2010 x-rays of Claimant's lumbar spine, cervical spine, and left wrist; Dr. Tao's treatment records from November 2011 and March 2012; and the results of Dr. Walker's and Dr. Waltrip's examinations of Claimant. (Tr. at 18-19). The undersigned concisely recapitulates that evidence, along with other pertinent evidence discussed by the ALJ throughout his decision.

The May 2007 MRI of Claimant's spine displayed some degenerative disc signal and a small central disc protrusion, although the interpreting radiologist's overall

40

impression was that Claimant's condition was stable. (Tr. at 13, 253). Shortly thereafter, in June 2007, Dr. Weinsweig observed that Claimant's straight leg raise test was normal, his motor strength was grossly strong, and his reflexes were equal. Dr. Weinsweig noted that Claimant reported chiropractic visits had improved his symptoms, and the doctor opined that surgery was unnecessary. (Tr. at 13, 256). The April 2010 x-ray of Claimant's lumbar spine showed degenerative change and disc space narrowing, but no acute displaced fracture or subluxation. (Tr. at 257). An x-ray of the cervical spine taken that same month displayed some degenerative change and grade one retrolisthesis. (Tr. at 258). As the ALJ noted, Claimant then treated with Dr. Thompson for a number of months, which provided him "significant relief." (Tr. at 13, 17). By that time that Claimant was released from Dr. Thompson's care in July 2010, his overall pain level had decreased from an eight out of ten to a two out of ten. (Tr. at 262, 299). In addition, at the time of his release from Dr. Thompson, Claimant indicated that his pain-free range of motion had improved (presumably in all areas that Dr. Thompson provided treatment: back, neck, and right shoulder), and that he had increased his activities of daily living. (Tr. at 262). As for Dr. Tao's treatment records, Dr. Tao performed surgery on Claimant's right shoulder in November 2011, which provided relief until reaggravation occurred during strength exercises at physical therapy. (Tr. at 314, 319). Claimant received a steroid injection in his shoulder from Dr. Tao in January 2012, which decreased his pain. (Tr. at 14, 351, 354). At a February 2012 visit, Dr. Tao noted that Claimant's shoulder pain to palpation had decreased and that active range of motion was improved in the right shoulder while range of motion was "full" in the neck. (Tr. at 14, 17, 351). Dr. Tao also observed that there were not focal strength deficits and that an examination of Claimant's upper extremities was unremarkable. (Tr. at 14, 351).

41

Overall, Dr. Tao opined that Claimant's condition was improving and recommended that Claimant continue physical therapy. (Tr. at 17, 351). At a March 2012 appointment, Dr. Tao observed that Claimant's shoulder continued to improve with less pain to palpation and increased active range of motion. (Tr. at 14, 349). Dr. Tao also recorded that Claimant had full range of motion in the neck with no cervical spine tenderness to palpation. (Tr. at 349). Dr. Tao opined that Claimant's condition was stable and that he could return to work the following month. (Tr. at 350).

The ALJ also found that the medical records from Claimant's brief treatment relationship with Dr. Carico did not support the doctor's opinions. (Tr. at 18). The ALJ noted that, at a July 2012 appointment with Dr. Carico, Claimant did not exhibit tenderness in his supraspinatus muscle, trapezius muscle, rhomboid muscle, and cervical spine. (Tr. at 14, 19). Additionally, the ALJ observed that there was no evidence of motor disturbances at that visit. (Tr. at 19). Moreover, the ALJ was also undoubtedly aware that Claimant visited Dr. Carico only twice before the doctor formed his RFC opinions, with one of those visits occurring for the purpose of obtaining a physical RFC evaluation. (Tr. at 14, 441).

Furthermore, the ALJ relied on the results of Dr. Walker's and Dr. Waltrip's evaluations of Claimant in assigning little weight to Dr. Carico's opinions. (Tr. at 19). After examining Claimant, Dr. Walker diagnosed him with right rotator cuff tear, left wrist sprain, and sprain or strain of the cervical, thoracic, and lumbar spine regions. (Tr. at 14, 417). The ALJ emphasized that Claimant described his lower back pain as only mild at his visit with Dr. Walker. (Tr. at 17, 18, 410). Dr. Walker determined that Claimant's symptoms were active, but stable, and that he would require additional doctor's visits only to establish a post-treatment plan. (Tr. at 413). He ultimately opined

42

that Claimant should be able to return to his past work or similar work with these limitations: Claimant could sit for eight hours with periods of rest; stand for seven hours with periods of rest; walk for two hours; perform repetitive actions of simple grasping with both hands, but he was only able to repetitively push and pull with his left hand; perform the repetitive actions necessary to operate foot controls or a motor vehicle with his right leg only; frequently lift ten pounds or less; occasionally lift up to forty pounds, push or pull objects weighing less than thirteen pounds, bend, twist, turn, type, and drive an automatic vehicle; and never squat, kneel, climb, crawl, reach above shoulder height, or drive a standard vehicle. (Tr. at 18, 413, 417). The ALJ assigned some weight to Dr. Walker's opinions as they were "considerate of" Claimant's impairments and were "somewhat" supported by Dr. Lo's opinions. (Tr. at 18).

As for Dr. Waltrip's evaluation of Claimant, the ALJ noted that Dr. Waltrip found no evidence of motor dysfunction, sensory loss, or reflex abnormalities. (Tr. at 14, 423-24). Dr. Waltrip also observed that Claimant had good grip strength and could perform both fine and gross manipulations. (Tr. at 14, 423). Additionally, Dr. Waltrip recorded limited flexion and abduction in Claimant's right shoulder, but noted that Claimant reported some resolution of his shoulder symptoms. (Tr. at 17, 422). Dr. Waltrip further observed limited flexion and limited extension in Claimant's lumbar spine, but found no evidence of spasm or muscle tenderness in his back. (Tr. at 14, 423). With regard to Claimant's allegations of osteoarthritis, the ALJ pointed out that Dr. Waltrip found no evidence of deformity, heat, tenderness, or redness in Claimant's joints. (Tr. at 17, 423). Dr. Waltrip concluded that Claimant's back and knee pain limited his ability to walk and stand for any "protracted" period of time, but that he could perform both in moderation. (Tr. at 18, 424). He also opined that Claimant could lift a "moderately heavy" object. (Tr.

at 18, 424). The ALJ assigned some weight to Dr. Waltrip's opinions. (Tr. at 18).

Finally, the ALJ summarized Dr. Lo's opinions before largely discounting those of Dr. Carico. (Tr. at 17-18). The ALJ assigned great weight to Dr. Lo's opinions because they were supported by record evidence.[5] (Tr. at 17). Specifically, the ALJ found that Dr. Lo's opinions were bolstered by the results of Claimant's 2007 MRI, Dr. Tao's treatment records, and Dr. Walker's and Dr. Waltrip's findings. (Tr. at 17-18).

Overall, the ALJ's finding that Dr. Carico's functional limitations opinion was entitled to little weight is supported by substantial evidence. As the ALJ stressed, Claimant's shoulder injury continuously improved with treatment until it was aggravated at a physical therapy in late 2011. (Tr. at 314). However, with conservative treatment and rest, Claimant's shoulder condition continued to improve through March 2012. (Tr. at 349, 351). At his March 2012 appointment with Dr. Tao, Claimant experienced less pain on palpation of his right shoulder and had improved active range of motion. (Tr. at 349). At that same visit, Claimant's right shoulder forward flexion and external rotation were both improved. (*Id.*) According to Dr. Walker, Claimant's shoulder had reached maximum medical improvement by April 2012 with active, but stable symptoms. (Tr. at 413). In addition, Dr. Lo opined that Claimant would be limited to only occasionally reaching using his right shoulder. (Tr. at 74).

With respect to Claimant's back pain, the May 2007 MRI of Claimant's spine displayed some degenerative disc signal and a small central disc protrusion; however, the interpreting radiologist's overall impression was that Claimant's condition was

---

[5] Agency consultants, like Dr. Lo, "are highly qualified physicians and psychologists who are experts in the evaluation of the medical issues in disability claims under the Act." SSR 96-6P, 1996 WL 374180, at *3 (S.S.A. 1996). Opinions from agency consultants must be given weight when they are supported by evidence in the case record, and "[i]n appropriate circumstances ... may be entitled to greater weight than the opinions of treating or examining sources." *Id.*

stable. (Tr. at 13, 253). One month later, Dr. Weinsweig observed that Claimant was in no acute distress in relation to his back pain and that a straight leg raise test was normal. (Tr. at 255). Dr. Weinsweig noted that Claimant reported chiropractic visits had improved his symptoms, and the doctor opined that surgery was unnecessary. (Tr. at 13, 256). Claimant continued to visit Dr. Thompson for chiropractic care until he was released with a pain level of two out of ten. (Tr. at 262). At his last visit with Dr. Thompson, Claimant described improved pain-free range of motion and increased activities of daily living. (*Id.*) After that point, Claimant's medical treatment focused almost exclusively on his shoulder condition. Indeed, Claimant reported that his low back pain was only mild at his evaluation with Dr. Walker. (Tr. at 410). While Dr. Waltrip noted that flexion and extension of Claimant's lumbar spine were limited by discomfort, he found no evidence of muscle tenderness of spasm in Claimant's back. (Tr. at 423). Dr. Waltrip opined that Claimant could both stand and walk in moderation. (Tr. at 424). In addition, Dr. Lo considered Claimant's back pain in assigning exertional and postural limitations that still permitted Claimant to work. (Tr. at 73-74).

Finally, in relation to Claimant's arthritis, Claimant only occasionally sought treatment for his left wrist. (Tr. at 286, 288, 325). An x-ray of the left wrist in July 2011 was normal. (Tr. at 326). Furthermore, Dr. Walker opined that Claimant could perform simple grasping as well as pushing and pulling with his left hand. (Tr. at 417). Additionally, Dr. Waltrip did not observe any signs of deformity, heat, tenderness, or redness in Claimant's joints. (Tr. at 423). Dr. Waltrip recorded that Claimant was able to make a fist, had good grip strength, and could perform fine and gross manipulations without limitation. (Tr. at 423-24). As for any other areas affected by arthritis (e.g. knees and ankles), there is little record evidence that Claimant sought treatment for

those conditions. (Tr. at 438-43). Moreover, Dr. Waltrip observed no heat, redness, or tenderness in Claimant's extremities and joints. (Tr. at 423). Dr. Lo considered Claimant's knee pain and still determined that he would still be able to perform certain exertional and postural activities. (Tr. at 73-74).

In sum, the undersigned **FINDS** that ALJ provided good reasons for assigning little weight to Dr. Carico's opinions and that the ALJ's determination is supported by substantial evidence. At the time that he formed his opinions, Dr. Carico saw Claimant only twice. That is certainly not the type of treatment relationship which permits a physician to develop a longitudinal picture of a patient's ailments and limitations; consequently, such a brief treatment relationship typically does not entitle the treating physician's opinions to special weight. Furthermore, Dr. Carico provided no explanation for the exertional and postural limitations that he assigned to Claimant, and he offered very little justification for the manipulative limitations that he determined were appropriate.[6] (Tr. at 432). Finally, the medical evidence and opinion evidence discussed by the ALJ and summarized above supports the ALJ's conclusion that Dr. Carico's opinions were entitled to little weight.[7]

Next, Claimant insists that the ALJ ignored Dr. Thompson's opinions that Claimant should never climb, balance, stoop, kneel, crouch, or crawl, and that he was limited in reaching in all directions and handling objects. (ECF No. 7 at 11; Tr. at 408).

[6] To the extent that Dr. Carico opined that Claimant was "limited" in reaching, handling, and fingering, neither he nor the form that he filled out defined "limited." (Tr. at 432).

[7] It is also worth noting that the vocational expert testified that an individual with the limitations described by Dr. Walker would be able to perform certain light and sedentary jobs. (Tr. at 51-52). Claimant's argument relies on the ALJ's purported failure to consider the postural and manipulative limitations assigned by Dr. Carico. (ECF No. 7 at 11). Dr. Walker's opinion as to Claimant's postural and manipulative limitations was very similar to Dr. Carico's opinion. *Compare* (Tr. at 417) *with* (Tr. at 432). Furthermore, at least one of the sedentary jobs identified by the vocational expert does not require *any* climbing, balancing, stooping, kneeling, crouching, crawling, reaching, handling, fingering, or feeling. Dictionary of Occupational Titles 379.367-010, 1991 WL 673244 (surveillance-system monitor).

The ALJ recognized that Claimant treated with Dr. Thompson and that Claimant experienced significant relief from that treatment, but ultimately assigned no weight to Dr. Thompson's opinion because he was not an acceptable medical source. (Tr. at 13, 17, 18). The ALJ correctly noted that Dr. Thompson is not an "acceptable medical source" as defined in 20 C.F.R. § 404.1513(a). As such, the ALJ was only required to *consider* Dr. Thompson's opinion as to how Claimant's impairments affect his ability to function, and the ALJ was only required to explain the weight assigned to Dr. Thompson's opinion *if* the doctor's opinion would affect the outcome of the case. *See* SSR 06-03P, 2006 WL 2329939, at *6; *see also Pack v. Colvin*, No. 2:13-25249, 2014 WL 6607019, at *20-*21 (S.D.W.Va. Nov. 19, 2014). The ALJ clearly considered Dr. Thompson's treatment records and his opinion, and he ultimately assigned no weight to Dr. Thompson's opinion, albeit for an impermissible reason. *See, e.g.*, *Carpenter v. Astrue*, 537 F.3d 1264, 1267-68 (10th Cir. 2008) (holding that ALJ could not "disregard" opinions of claimant's chiropractor solely on basis that chiropractor was "other source"); *Carey v. Colvin*, No. 3:12-cv-01509-KI, 2013 WL 6506878, at *8 (D. Or. Dec. 12, 2013) (stating that status as "other source" is insufficient reason to reject opinion). Nevertheless, the undersigned **FINDS** that any error in the ALJ's discussion of Dr. Thompson's opinion was harmless because the ALJ considered Dr. Thompson's treatment records in his written decision, and Dr. Thompson's functional limitations opinion was nearly identical to Dr. Carico's opinion, which the ALJ properly determined was entitled to little weight. Accordingly, remanding this case to the ALJ for further consideration of Dr. Thompson's opinion would not change the outcome. *See, e.g.*, *Tobey v. Comm'r of Soc. Sec.*, No. 11-15069, 2013 WL 1010727, at *11 (E.D. Mich. Feb. 22, 2013) (stating that remand to consider "other source" opinion is unnecessary where consideration of

47

opinion would not alter outcome and collecting cases), *report and recommendation adopted by* 2013 WL 1016736 (E.D. Mich. Mar. 14, 2013). Indeed, Dr. Thompson formed his opinion nearly twenty months after he last treated Claimant in July 2010, at which point Dr. Thompson released Claimant from his care as a result of Claimant's improvement. (Tr. at 262, 408). As such, the limitations ascribed to Claimant by Thompson seem excessive and unsupported by the record. *Cf. Pack*, 2014 WL 6607019, at *21 (noting that remand may be appropriate to consider "other source" opinion where opinion is "clear, cogent and supported" by record).[8] Consequently, remand for further consideration of Dr. Thompson's functional limitations opinion is not warranted.

Accordingly, the undersigned **FINDS** that the ALJ properly weighed Dr. Carico's opinion, and that the ALJ adequately explained the reasons for the weight he gave to that opinion. Additionally, the undersigned **FINDS** that any error in the ALJ's consideration of Dr. Thompson's opinion was harmless.

### C. Combination of Impairments Equivalent to a Listing

Finally, Claimant asserts that "the totality of [his] medical and mental problems, when combined, totally disable him and meet or exceed the combination of impairments listing provided by the Social Security Regulations for disability."[9] (ECF No. 7 at 12). Claimant further insists that "[t]he overwhelming and contradicted competent medical evidence from multiple medical providers confirms that the combined effect of the plaintiff's severe physical impairments render him unable to function for 8 hours in any

[8] Unlike here, in *Pack*, there was not a nearly identical functional limitation opinion rejected by the ALJ for permissible and supported reasons.

[9] Claimant generally mentions "mental problems," but does not cite any evidence of mental problems in his discussion of the issue. (ECF No. 7 at 12). Moreover, he does not dispute the ALJ's finding that his alleged mental impairments are non-severe. (Tr. at 12-13); *see also* (Tr. at 59-61, 71-72).

48

type of job."[10] (*Id.*)

A determination of disability may be made at step three of the sequential evaluation when a claimant's impairments meet or medically equal an impairment included in the Listing. 20 C.F.R. § 404.1520(a)(4)(iii). The purpose of the Listing is to describe "for each of the major body systems, impairments which are considered severe enough to prevent a person from doing any gainful activity." *Id.* § 404.1525. Because the Listing is designed to identify those individuals whose medical impairments are so severe that they would likely be found disabled regardless of their vocational background, the SSA has intentionally set the medical criteria defining the listed impairments at a higher level of severity than that required to meet the statutory standard of disability. *Sullivan v. Zebley*, 493 U.S. 521, 532, 110 S.Ct. 885, 107 L.Ed.2d 967 (1990). Given that the Listing bestows an irrefutable presumption of disability, "[f]or a claimant to show that his impairment matches a listing, it must meet *all* of the specified medical criteria." *Id.* at 530.

To demonstrate medical equivalency to a listed impairment, a claimant must present evidence that his impairment, unlisted impairment, or combination of impairments, is equal in severity and duration to all of the criteria of a listed impairment. *Id.* at 520; *see also* 20 C.F.R. § 404.1526. Under the applicable Regulations, the ALJ may find medical equivalence in one of three ways: (1) if the claimant has an impairment that is described in the Listing, but (i) does not exhibit all of the findings specified in the listed impairment, or (ii) exhibits all of the findings, but does not meet the severity level outlined for each and every finding, then equivalence

---

[10] In this challenge, Claimant again attacks the ALJ's analysis of Dr. Carico's and Thompson's opinions, an argument that the undersigned rejects above. To extent that Claimant argues that the ALJ ignored the opinions of Dr. Tao, there are no functional limitation opinions from Dr. Tao in the record. (ECF No. 7 at 13). However, Dr. Tao did opine that Claimant could return to work in April 2012. (Tr. at 350).

can be established if the claimant has other findings related to the impairment that are at least of equal medical significance to the required criteria; (2) if the claimant's impairment is not described in the Listing, then equivalency can be established by showing that the findings related to the claimant's impairment are at least of equal medical significance to those of a similar listed impairment; or (3) if the claimant has a combination of impairments, no one of which meets a listed impairment, then equivalency can be proven by comparing the claimant's findings to the most closely analogous listings. If the findings are of at least equal medical significance to the criteria contained in any one of the listings, then the combination of impairments will be considered equivalent to the most similar impairment. 20 C.F.R. § 404.1526(b). However, the ALJ "will not substitute [a claimant's] allegations of pain or other symptoms for a missing or deficient sign or laboratory finding" in determining whether a claimant's symptoms, signs, and laboratory findings are medically equal to those of a listed impairment. *Id.*

Contrary to Claimant's assertion, however, there is no "combination of impairments" listing. Instead, the Supreme Court has explained that "[f]or a claimant to qualify for benefits by showing that his unlisted impairment, or combination of impairments is 'equivalent' to a listed impairment, he must present medical findings equal in severity to *all* the criteria for the one most similar listed impairment. ... A claimant cannot qualify for benefits under the 'equivalency' step by showing that the overall functional impact of his unlisted impairment or combination of impairments is as severe as that of a listed impairment." *Zebley*, 493 U.S. at 531. "The functional consequences of the impairments ... irrespective of their nature or extent, *cannot* justify

a determination of equivalence." *Id.* at 532 (citing SSR 83-19, 1983 WL 31248).[11] "This is because the listings permit a finding of disability based solely on medical evidence, rather than a determination based on every relevant factor in a claim." *Lee v. Comm'r of Soc. Sec.*, 529 F. App'x 706, 710 (6th Cir. 2013) (citing *Zebley*, 493 U.S. at 532). Thus, to determine whether a combination of impairments equals the severity criteria of a listed impairment, the signs, symptoms, and laboratory data of the combined impairments must be compared to the severity criteria of the Listing. Accordingly, Claimant's assertion that "competent medical evidence from multiple medical providers confirms that the combined effect of the plaintiff's severe physical and mental impairments render him unable to function for 8 hours in any type of job," (ECF No. 7 at 12), is insufficient to establish that his combination of impairments is equivalent to a listed impairment that would warrant a finding of disability. In sum, Claimant has failed to identify any specific listing that his impairments meet or equal, and his functional impact argument is unavailing. *See Nye*, 2014 WL 2893199, at *24-*25 (rejecting identical argument). Therefore, the undersigned **FINDS** that this challenge to the Commissioner's decision is without merit.

## VIII. <u>Recommendations for Disposition</u>

Based on the foregoing, the undersigned United States Magistrate Judge respectfully **PROPOSES** that the District Court confirm and accept the findings herein and **RECOMMENDS** that the District Court **DENY** Plaintiff's Motion for Judgment on the Pleadings, (ECF No. 7), **GRANT** Defendant's Motion for Judgment on the Pleadings, (ECF No. 8), and **DISMISS** this action, with prejudice, from the docket of

---

[11] SSR 83-19 has been rescinded and replaced with SSR 91-7c, which addresses only medical equivalence in the context of SSI benefits for children. However, the explanation of medical equivalency contained in *Sullivan v. Zebley* remains relevant to this case.

the Court.

The parties are notified that this "Proposed Findings and Recommendations" is hereby **FILED**, and a copy will be submitted to the Honorable Robert C. Chambers, United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days (filing of objections) and three days (mailing) from the date of filing this "Proposed Findings and Recommendations" within which to file with the Clerk of this Court, specific written objections, identifying the portions of the "Proposed Findings and Recommendations" to which objection is made, and the basis of such objection. Extension of this time period may be granted by the presiding District Judge for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. *Snyder v. Ridenour*, 889 F.2d 1363 (4th Cir. 1989); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984). Copies of such objections shall be provided to the opposing party, Judge Chambers and Magistrate Judge Eifert.

The Clerk is directed to file this "Proposed Findings and Recommendations" and to provide a copy of the same to counsel of record.

**FILED:** June 30, 2015

Cheryl A. Eifert
United States Magistrate Judge

52